The government's first words to the jurors at the trial of Anthony Pandrella revealed that the true focus of the trial would not be determining whether or not Mr. Pandrella committed a house act robbery. The APUSA intoned, on Friday in the fall of 2018, two loud bangs rang out through a big house on the corner lot on Emmons Avenue, and a 77-year-old man, Vincent Zito, slumped to the floor. She continued, the man who fired the gun is in this courtroom and he's sitting behind me. It's Anthony Pandrella. The jury was thus informed that the principal charge against Mr. Pandrella was not the robbery that was in the top count of the indictment that had been read to them a moment before by the judge. The charge was murder, and the theory behind that murder was of the classic variety suitable for an episode of Law & Order or any other state court legal procedural drama. Zito, the victim, was a loan shark. He entrusted a sizable sum of cash to his best friend, Pandrella, for safekeeping. When Pandrella, either through neglect or betrayal or for some other reason, proved unable to return the cash, the friendship between the men devolved into anger, threats, and ultimately a murder. The indictment's top-sec count robbery was, quite literally, an afterthought. The government theorized that Pandrella, having just shot his old friend in the head, paused as he exited the crime scene to pocket several watches that had been on display in Zito's sitting room. The theft of the watches served but one purpose in the government's case. The theft, if it were presented with evidence that Zito was engaged in the business of loan sharking at the time of his death, would have provided a basis for the hotline robbery charge that, in turn, served as the jurisdictional predicate for Mr. Pandrella's prosecution in federal court. The problem, detailed in Puentland, our opening brief, was that the Zito was engaged in the business of lending at the time of his death. The jurisdictional rationale behind the government's case disintegrated at trial because of the testimony of its own witnesses. There was, to be sure, plenty of evidence that Zito had, at one time, engaged in loan sharking. He was convicted of that crime in 1972, and as late as the year before his murder, he continued to make usurious loans to a small group of tradesmen that lived in his neighborhood. Counsel, I understand your argument was that Mr. Zito had retired from his loan sharking business, but wasn't there evidence that he, I mean, that he still was owed money, that his business had not wrapped up? Your Honor, there was evidence that he was wrapping up his business at the time. So he wasn't fully retired, and isn't that enough under the case law that loan sharking involves interstate conduct, which is your first argument? So, Your Honor, the testimony of the person closest to Zito, his daughter, Samantha, was that by 2018, Zito was sick, and he was taking his money out the street, as Your Honor pointed out, he was only collecting at that point. In order for a business to serve as a, to have an interstate nexus under this Court's precedence, the main theory is the depletion of assets theory, which is that the assets that were taken from the business, right, would have been monetized, and those proceeds would have been reinvested into business, whatever the interstate commerce business was engaged in. That was explicitly the theory in Elias. In that case, the government charged a stick-up robbery of the victim's grocery store in federal court, and the court reasoned that because the grocery store bought beer and fruit from an in-state supplier, who in turn had purchased the beer and fruit from out-of-state, that there was a basis for interstate jurisdiction. But the reason for that, and the logic of that money, the grocery store would have purchased more beer and fruit. The same applies to Jamison, where the victim had money— So if Mr. Zito had not collected those outstanding loans that he had with, through his loan-sharking business, wouldn't those businesses have purchased other items as well? Your Honor, there was no, there was no, there's no evidence about whether or not they would do that, but I think that that rationale would be reversed. If the businesses that had, there was actually only one person paying back Zito's chimney loan, if he stopped paying back Zito, which in fact he did not continue to make payments to the family after Zito's death, but had he stopped, his business would have had more— I thought there were three, San Miguel, Leo. They all testified that they finished paying him back before, the summer before he died. The only person who was still actively in new payment, so there were two, was Jimmy Liu and Zeance, but Zeance is the gentleman who had given the watches to— Because he borrowed $50,000 shortly before his murder. But in this case, he did it for personal expenses. His death. His death. There was no claim that he, that Mr. Zeance was engaged in interstate commerce. To the extent that Jimmy Liu was engaged in interstate commerce, the fact that he may not have repaid the loan was not the period the government has to trial. Thank you. I don't want to take time from your other arguments here. So I think that Your Honor went right to the heart of the matter, which is that the government's two rationales for interstate commerce both reduce to a depletion of assets theory. That makes sense because that is the main theory in cases of this sort that this court has exposed. In order to establish that theory, they had to establish that Zito, had he not been murdered, would have put more money out onto the street, right? If the assets taken from his loan-sharking business, had they not been taken, would have been reinvested in the business. It would have been put back out on the street to loans to businesses who would then fuse that money to interstate commerce. There was no evidence whatsoever that Zito intended to ever make another loan again. In fact, the evidence was all to the contrary. All the government's witnesses specified that Zito was never going to make an interest-bearing loan again in his life. For that reason alone, the depletion of assets theory is inapplicable to this case. That leaves only the government's secondary theory, which is that the watchless foreign manufacturer standing alone is a basis for interstate jurisdiction. That simply is far, far beyond anything that this court has ever been to hold. It would effectively make every robbery that occurs on the street a federal issue, because as we know, most goods are manufactured outside of New York. So I think that the court doesn't need to go into the issue of whether or not the watches, which were collateral for an interest-free loan, were business assets. It's irrelevant. Because Mr. Zito is no longer seeking to profit from lending money, the fact that those assets were stolen and that he was deprived of proceeds from his business is irrelevant. He no longer planned to reinvest that money in his business, so there was no impact on interstate commerce. For that reason alone, the jurisdictional predicate fails, and each count of the indictment must be dismissed. So the fact—I said I would not press this issue—but the fact that Mr. Liu, who you admitted still owed him money, Mr. Zito money, the fact that he Therma True Doors, and using that money, that is not enough for interstate commerce. I mean, the fact he wouldn't have to pay him back. He would use that money to continue his business and purchase items interstate. I follow what you're saying. You're saying that because Zito's money, albeit loan-sharking is illegal, he would have this illegal money that he was able to keep because he didn't have to pay Mr. Zito back and use it for interstate commerce. That's not enough? Well, the evidence was that in 2015, Jimmy Liu borrowed money from Vincent Zito and used that money to fund his business, which was engaged in interstate commerce. If I hear Your Honor correctly, you're suggesting that in 2018, if Jimmy Liu no longer had to make payments to Mr. Zito, then he would have more money to invest in his business. Whether or not that was the case, I don't know, because it's not in the record. That wasn't a theory that was propounded to the jury at court. It may potentially have been a theory of interstate commerce, but it wasn't the one that the government proceeded on, and it would be speculative to say that Jimmy Liu, who, by the way, was indicted at the time of the trial for an issue regarding his business, would have invested the money that he didn't pay Mr. Zito into his interstate commerce business. I believe I am out of time now, so unless you have any questions. All right. Yes, thank you. Thank you. Good morning, Your Honors, and may it please the Court. My name is Kristen Mace. I'm an assistant U.S. attorney in the Eastern District of New York. I also represented the government in the trial that resulted in Anthony Pandrella's conviction of hot-deck robbery, illegal use of a firearm, and murder. The District Court's judgment of conviction should be affirmed because there was sufficient evidence for the jury to conclude that the robbery of Vincent Zito affected interstate commerce, and although my friend has not argued today about the evidentiary issues, we do submit as well that the District Court did not abuse its discretion in those evidentiary decisions, but I would focus today on the sufficiency of the evidence argument. The evidence at trial established beyond a reasonable doubt, and I want to emphasize not by mere inference but by direct evidence, that Anthony Pandrella robbed and murdered the victim, Vincent Zito. That is not in dispute, but in disappeal, that the robbery, in the robbery, Pandrella targeted and stole luxury Swiss watches from the victim's place of business, which was also his home. The victim's business, his only means of making money, which yielded hundreds of thousands of dollars, if not more, was illegal loan sharking. The victim's business was long running with numerous customers and a standard interest rate of three percent per week, although some did pay less and some even paid no interest on their loans. The victim's customers, and you can testify that they could not borrow from banks, used that money for their small business expenses, such as buying building supplies that traveled in interstate commerce, making payroll for the employees, and other expenses. I also want to emphasize that the evidence established that the victim's business was not a small-time affair. He had more than $750,000 in cash to use for loans, which, just prior to his death, he asked the defendant to hold for safekeeping because he believed he was quote-unquote hot, meaning under the scrutiny of law enforcement. The Swiss watches stolen by the defendant had been posted as collateral for a $50,000 loan made as part of the victim's business shortly before the robbery. The business remained active at the time of the robbery. Let's focus on that point, counsel. Yes. Assuming that all of this about what happened prior to, say, three to six months before his Well, I guess two questions. Do I need this evidence in order to find the jurisdictional hook, and what is it? Which is that had those watches not been stolen, he would have used either the watches themselves or the repayment that was in hopes of the return of the watches in interstate commerce in the future. So first, the question is, do we need to find that? And the second question is, if we do, what was the evidence of that? So as to the first part of it, you do not need to find it. And none of the cases from this court have required affirmative proof of future business by any of the businesses at issue in the cases. But if it's a depletion of assets theory, and the theory of depletion of assets is that by stealing this, you are unable to use this in interstate commerce, isn't that sort of definitionally requiring a future-looking approach? At most by inference, Your Honor, but on note, none of the cases require that type of proof. And so, for example, if we look at the most recent case from this court, McIntosh in 2023, there the victim was a loan shark, and based on the facts that were in the underlying brief, there was only one borrower who testified that he borrowed from the victim two times. There was no affirmative proof that there was going to be future loans, but if that were required, that inference is permitted by the fact that the ongoing business is referenced. And so even if the—I want to get to the factual point, if I could, Your Honor, as well—even if the victim was in a wind-down mode and was only collecting extensions of credit, that still affects interstate commerce. And so earlier— Well, that business does, but does the loss of the watches affect interstate commerce if the business at that point is limited to collection? Yes. That, for one, the watches themselves exited interstate commerce. $50,000 worth of watches that no longer were going to go back to Yuri Zayans, and he didn't have to pay that $50,000 back. That's a significant effect on interstate commerce, much more significant than some of the cases that are referenced. And so that alone is enough. And I do want to emphasize, because my opponent said something to the contrary, that it absolutely was established that the loan to Yuri Zayans was part of the loan-sharking business. And this was a questioning from defense counsel of Yuri Zayans, and he asked—I'm sorry, he was—I'm asking another witness who'd been present when Yuri Zayans borrowed the money. And he said, and you were present when Yuri Zayans came to Mr. Zito's house on loan-sharking-related business, correct? Answer, yes. And that was, I believe you said, in the summer of 2018. That's the summer right before Mr. Zito was murdered. And so the defense counsel elicited himself that the business was ongoing and that that loan itself was part of the loan-sharking business. And I just want to step back for a moment and explain why that was. It's not clear from the briefing. The theory of the defense at trial was that there was an alternative perpetrator. And so the defense went to great lengths to emphasize the fact that there were many borrowers that would have an interest and a motive to kill and rob the victim. And so the defense counsel argued in Government's Appendix 198, it was clearly well known that Mr. Zito was a loan shark in the neighborhood who had huge sums of cash in his home. So the vast array of people who could—wanted to get into that house to burglarize it and surprise him is probably as big as Brooklyn. So the defense wanted to emphasize this business, and in particular two borrowers. The defendant, before he was charged, he made a statement to the FBI, which was then admitted at trial, and he sought to direct attention to two borrowers who he referred to by their ethnicity. He referred to a Chinese borrower and a Russian borrower. That was Jimmy Liu and Yuri Zayants. And then at trial, the defense was the same. The emphasis was on Yuri Zayants as having a motive and an opportunity to kill and rob the victim. And so at trial, there was no dispute, and the inference was drawn by both the government and the defense that there was an ongoing business and that that business was the target of the robbery. The evidence that was offered by the government, I just want to emphasize, it far exceeded any of the cases that are cited by the briefing before your honors. The government presented the testimony of six borrowers of the victim's business in addition to the testimony of three friends and family members who described the business. Not a single one of them described the victim as retired. Not a single one. There were, there was testimony that the victim was looking forward to retirement. I think there was a reference to a five-year plan where in the future the victim would retire, but there was no evidence at all that the victim had exited the business. And so that, I think, addresses the retirement issue. I believe there was reference also, I'll just touch on it briefly, to the fact that there was no interest on the loan to Yuri Zayas. As I noted already, both parties agreed and the defense counsel elicited the testimony that that was part of the business. And I think it's important to keep in mind that not every transaction has to be a money-making transaction for a business to engage in interstate commerce. Indeed, a business does not have to be profitable. A non-profit could be the victim of a Hobbs Act robbery. And if it had been the case, and it was not here, but if it had been the case that Vincent Zito had simply, in a charitable way, given loans to small businesses so that they could operate in interstate commerce, that would be sufficient. Here, the evidence was that there was a mix of both I see that my time is up. I respectfully ask that the court affirm the judgment of conviction. All right, thank you. Mr. Sivella, you have some rebuttal time. Just beginning, I think that there is no purely factual dispute here. The facts were that Vincent Zito has been a business attached to it since 2017. Does making loans without interest required not affect interstate commerce? It's not a business, Your Honor. I don't think that anyone would assert that somebody who loans money at no interest to acquaintances or family members is subject to federal regulation, or that that transaction has a cognizable impact on interstate commerce. So, yes, I think that although the business does not have to be profitable—I mean, that's just obvious, but it's also irrelevant—business, whether or not it's profitable, is a money-making endeavor. So, I mean, many of us don't make profits, although we intend to, and that's why we're in business. And that's clear from the Black's Law Dictionary of the Middle East, which discusses that term. It's a money-making endeavor. Moving on from that issue, I'd like to—well, but before I do that, so Mr. Zito had not made a loan for interest since 2017. His daughter testified that he was taking his money off the street, and every witness the government put on the stand either corroborated that testimony or did not contradict it. So, there is absolutely no basis, no jury could have rationally found that Mr. Zito would ever make a loan with interest attached to it again. And that's the core point, the dispositive point of this case. I would encourage the court to challenge the government's assertion that the court has never held that affirmative evidence of future use is necessary in order to have a in Elias, in Jamison, and in Wilkerson, which I think are the three principal cases on that theory. The court noted in each that the victim, having not been robbed, would have reinvested the proceeds of the robbery into the business. In Elias, it was fruits and beer. In Jamison, it was cocaine and secondhand clothes. And Wilkerson—I mean, the court discussed it at length, the fact that the victim planned to use the money that he had in his pocket at the time of the robbery to go to Home Depot and purchase more supplies for his landscaping business. Of course, that's the integral element of the depletion of assets theory. So, the assertion that the court has never required affirmative evidence of that is just false. Unless there are any other questions from the floor. Thank you very much.